# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information associated with the cellular telephone<br>assigned call number (303) 242-9535, ("Target<br>Telephone"), whose wireless service provider is<br>**Verizon Wireless Corporation** | ) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )  Case No. 21-sw-735-STV |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A,"** which is attached to and incorporated in this Application and Affidavit

located in the _____State and_____ District of _____New Jersey_____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B,"** which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC § 2113(a) | Bank Robbery. |

The application is based on these facts:

X  Continued on the attached affidavit, which is incorporated by reference.
☒ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Donald Peterson*
*Applicant's signature*

Donald Peterson, Special Agent, FBI
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: __July 12, 2021__

*Judge's signature*

City and state: __Denver, CO__

Scott T. Varholak, U.S. Magistrate Judge
*Printed name and tit*

# **ATTACHMENT A**

Property to Be Searched

1. The account associated with the cellular telephone assigned call number 303/242-9535, ("Target Telephone"), whose wireless service provider is Verizon Wireless Corporation, a company headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921.

2. Records and information associated with the Target Telephone that is within the possession, custody, or control of Verizon Wireless.

# **ATTACHMENT B**

## Items to be Seized

I. Information to be Disclosed by the Provider

1. To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time periods of **July 9, 2020 through April 14, 2021**:

    a. Subscriber Records: The following information about the customers or subscribers of the Account:

        ii. Names (including subscriber names, user names, and screen names);

        iii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iv. Local and long-distance telephone connection records;

        v. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        vi. Length of service (including start date) and types of service utilized;

        vii. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        viii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

ix. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. Call/Text/Data Detail Records: All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

ii. All historical location information, including data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Account for the time periods of **July 9, 2020 through April 14, 2021**.

c. Specialized Location Records: All call, text, and data connection location information, related to all specialized carrier records that may be referred to as NELOS (Network Event Location System), RTT (Real Time Tool), PCMD (Per Call Measurement Data), TDOA or Timing Advance Information (also known as TruCall), Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and Sector of the device in relationship to the network when connected to the network with the identified mobile number account, **July 9, 2020 through April 14, 2021.**

d. Carrier Key related to call detail, text messages, data connections, IP logs, IP Sessions, web site and/or application connections, and cell site information.

e. Cell Site List(s): List of all cell-sites for **July 9, 2020 through April 14, 2021** for all state(s) in which the above records used cell locations. Cell site lists to include switch, cell-site number, name, physical address, longitude and latitude, all sectors associated with each cell-site, azimuth, and beam-width of each related sector.

II. Information to be Seized by the Government

1. All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. §2113 during the periods referenced herein.

2. All information described above in Section I that constitutes location information of the Target Telephone in relation to violations of 18 U.S.C. §2113.

3. All information related to the identity of the user, owner, operator, or subscriber of the target phone number and any devices associated with the target phone number.

4. All information related to the identity of any potential co-conspirators involved in violations of 18 U.S.C. §2113 in communication with the target phone number during the periods referenced herein.

III. Execution and Delivery

1. Pursuant to 18 U.S.C. 2703(g), the presence of an agent is not required for service or execution of this warrant.

2. The Provider shall deliver the information set forth above within 7 days of the service of this warrant and the Provider shall send the information via United States mail, and where maintained in electronic form, on CD-ROM or an equivalent electronic medium, to:

> Special Agent Donald Peterson
> Federal Bureau of Investigation, CR-3
> 8000 East 36th Avenue
> Denver, Colorado 80238

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the location information and account related data. See 18 U.S.C. § 3103a(b)(2).

IV. Order of Non-Disclosure

1. Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b)(1), the Court orders Verizon Wireless not to disclose the existence of this warrant to the subscriber for a period of 30 days from the date of this warrant's issuance.

CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO

FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)


I, _____, attest, under penalties of perjury by the laws of the

United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this

certification is true and correct. I am employed by Verizon Wireless and my title is

_____. I am qualified to authenticate the records attached hereto

because I am familiar with how the records were created, managed, stored, and retrieved. I state

that the records attached hereto are true duplicates of the original records in the custody of

Verizon Wireless. The attached records consist of _____ [GENERALLY DESCRIBE

RECORDS (pages/CDs/megabytes)]. I further state that:

> a. all records attached to this certificate were made at or near the time of the occurrence
> of the matter set forth by, or from information transmitted by, a person with knowledge
> of those matters, they were kept in the ordinary course of the regularly conducted
> business activity of Verizon Wireless, and they were made by Verizon Wireless as a
> regular practice; and

> b. such records were generated by Verizon Wireless electronic process or system that
> produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody

of Verizon Wireless in a manner to ensure that they are true duplicates of the original records;

and

2. the process or system is regularly verified by Verizon Wireless, and at all times pertinent to

the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the

Federal Rules of Evidence.


Date                        Signature

# UNITED STATES DISTRICT COURT
## FOR THE
### DISTRICT OF COLORADO

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Donald Peterson, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.   This affidavit is made in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned number 303/242-9535 (defined in Attachment A hereto as the "Target Telephone"), whose service provider is Verizon Wireless, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey. The location to be searched and the information to be seized are described in the following paragraphs and in Attachments A and B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2.   Your Affiant is a Special Agent of the Federal Bureau of Investigation (FBI) currently assigned as the Bank Robbery Coordinator at the Rocky Mountain Safe Streets Task Force. **Your Affiant is responsible for investigating violent crime in the Denver metropolitan area, including bank and business robberies. Your Affiant has been an FBI Special Agent for approximately 16 years and has training and experience in the investigation of violent crimes, including homicide, robbery, gang-motivated violence, drug offenses, weapons offenses, hate crimes, crimes against children, and civil rights violations.** These investigations have utilized physical and electronic surveillance, financial analysis, subject/witness interviews, surreptitious recordings, undercover operations, search warrants, arrests, utilization of informants, seizure and analysis of computer and telephone information, and various other techniques.

3.   Your Affiant has experience conducting investigations involving cellular telephone exploitation and analysis. Your Affiant is familiar with the types of information and evidence available through such exploitation and analysis. Your Affiant has conducted numerous investigations during which critical information and evidence were obtained through the review

1

of location data, call detail records, and other general communication activity related to cellular telephones.

4.   The facts set forth in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement professionals and witnesses. This affidavit is intended to demonstrate that probable cause exits for the issuance of the requested search warrant. As such, not all information developed during the course of this investigation is provided herein. Instead, only the information required to show probable cause is detailed below.

5.   Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. §2113 (Bank Robbery) have been committed by JARED LINCOLN FITZGERALD. There is also probable cause to believe that telephone location information described in Attachment B constitutes evidence of these criminal violations.

6.   The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in Title 18 U.S.C. § 2711. Specifically, the Court is a District Court of the United States that has jurisdiction over the offense being investigated.

## PREVIOUS 2006 BANK ROBBERIES
## COMMITTED BY JARED LINCOLN FITZGERALD

### April 2006 Two Arizona Bank Robberies

7.   On April 24, 2006, an unidentified man (the robber) entered the Chase Bank at 3970 West Ray Road, Chandler, Arizona. The robber approached the teller counter and handed the victim teller a note that read, "This is a robbery.  I have a gun in the bag." The robber told the victim teller to calm down and to move quickly. The victim teller provided the robber with $1,000 before the robber left on foot.

8.   The robber was described as a white male, 25-35 years old, 6'-6'5", medium build, with light brown hair.

9.   On April 27, 2006, an unidentified man (the robber) entered the Bank of America at 1961 West Baseline, Mesa, Arizona. The robber approached the teller counter and presented the victim teller with a note that read, "THIS IS A ROBBERY. THERE IS A GUN INVOLVED. GIVE ME ALL YOUR MONEY." The robber lifted the front of his shirt and displayed a small handgun in his waistband.

10. As the victim teller started to retrieve money, the robber said, "No, go for the 100's. Give it all." The robber repeatedly said, "Hurry, you're going too slow." The robber took the money and casually exited the bank.

11. The robber was described as a white male, 5'11"-6', medium build, with brown hair.

## May 2006 Five Arizona Bank Robberies

12. On May 5, 2006, an unidentified man (the robber) entered the Washington Mutual at 3418 North 17th Avenue, Phoenix, Arizona. The robber approached the teller counter and presented the victim teller with a note that read, "This is a robbery, empty your drawers, big bills first." The victim teller explained that the cash was only dispensed through an ATM-style machine requiring a card. The robber collected the note and left on foot.

13. The robber was described as a white or Hispanic male, 30-35 years old, approximately 6'2", 205-210 pounds with dark hair graying near the temples.

14. On May 6, 2006, an unidentified man (the robber) entered the Bank of America at 3930 East Broadway, Phoenix, Arizona. The robber approached the teller counter and presented the victim teller with a note that read, "GIVE ME ALL YOUR MONEY. I HAVE A GUN." As the robber placed the note inside his backpack, the victim teller observed a black handgun inside. The robber said, "Give me all your hundreds." The victim teller explained he only had smaller bills. The victim teller gave the robber several small bills and a dye pack device. The robber exited the bank.

15. The robber was described as a white male, 20-27 years old, approximately 6'2", 180-200 pounds.

16. On May 12, 2006, at approximately 2:45pm, an unidentified man (the robber) entered the World Savings Bank at 1781 East Warner, Tempe, Arizona. The robber approached the teller counter and presented the victim teller with a note that read, "I am a robber, I have a gun and due have a bomb, give me the money." The robber demanded 100-dollar bills, but the victim teller only had smaller bills available. After receiving the money, the robber left the bank.

17. The robber was described as a white male, 20-30 years old, approximately 6'0" with a medium build.

18. On May 20, 2006, an unidentified man (the robber) entered the Chase Bank at 444 West Broadway, Tempe, Arizona. The robber approached the teller counter and presented the victim

teller with a note that read, "Give me all your cash. Do not include dye pack." The victim teller placed a stack of money on the counter, but the robber demanded larger bills. After the victim teller said she did not have any larger bills, the robber took the money and exited the bank.

19. The robber was described as a white male, 25-30 years old, 5'10"-5'11" and approximately 150 pounds.

20. On May 23, 2006, at approximately 2:00pm, an unidentified man (the robber) entered the World Savings Bank at 1781 East Warner, Tempe, Arizona. The robber approached the teller counter and presented the victim teller with a demand note. The robber asked, "Remember me?" The victim teller said she did remember the robber from the May 12, 2006 robbery. The robber said, "Do it faster this time." She explained that she still did not have access to larger bills. The victim teller placed a stack of money on the counter. The robber said "thank you," took the money, and exited the bank.

21. The robber was described as a white male, late 20's or early 30's, 5'8"-6'0", 180-190 pounds, with brown hair with areas of gray.

**June 2006 Two Wyoming Bank Robberies**

22. On June 12, 2006, at approximately 12:41 pm, an unidentified man (the robber) entered the Security First at 2501 East Lincolnway, Cheyenne, Wyoming, and handed the bank teller a note. The note directed the teller to go to the safe and place large bills into the canvas bag he provided. The note indicated the robber had a gun; however, no weapon was displayed. The robber left the bank with $1,200.00, including five twenty-dollar bills of recorded bait bills.

23. The robber was described as a white male, approximately 6'0" tall, 170 pounds, an unshaven face and dark hair, with graying hair around the ears.

24. On June 29, 2006, at approximately 9:20 a.m., an unidentified man (the robber) entered the Bank of the West at 410 SE Wyoming Boulevard, Casper, Wyoming. The robber walked to the center island of the lobby and appeared to be writing on a deposit slip. After a few moments, he approached the financial services officer, showed her a deposit slip and asked about "opening a business account." He then handed her a stack of stapled papers and told her to read the last one. Based on her memory, the note read as follows:

This is a bank robbery. Go to your vault and fill up the bag. Don't talk to anyone. I have a gun. You have 23 seconds. When I get the bag back I will dump it out on the lobby floor to check for dye packs.

25. She then told him that it would require another teller to enter the vault and he replied, "O.K." She entered the vault with a second teller and then, among themselves, asked what bag to use to put the money in. The robber answered by telling them to "use this bag." She retrieved the black canvass bag, filled it with money from the vault, and handed it over the counter back to the robber. He then departed the bank in an unknown direction. No weapon was seen by the teller.

26. One teller described the robber as a white male, 6' to 6'4", medium build with dark, short hair with some gray on the sides.

**July 2006 Utah Bank Robbery**

27. On July 20, 2006, an unidentified man (the robber) entered the Credit Union One at 1773 West North Temple, Salt Lake City, Utah. The robber told a bank employee, identified as H.R., he was new to the area and he was interested in opening a business account associated with a new McDonald's franchise. The robber said he would return the following day with his partner to complete the process.

28. On July 21, 2006, the robber returned to the credit union. He sat down in H.R.'s office and said his business partner would be right in. The robber then gave H.R. a note that stated (in summary) not to move to the left or right and that she had 30 seconds to go to the vault and get money and get money and get out and that if she didn't wait 30 seconds after he left to push the alarm, she would be the first to be shot.

29. H.R. complied with the demands. She asked a co-worker, identified as M.G., to accompany her to the vault because access required two employees. H.R. put the money from the vault into a bag provided by the robber. The robber then left the bank with $70,000.

30. The robber was described as a white male in his late 30's, 6'1"-6'2" with salt and pepper hair.

## ARREST, INTERVIEW, AND CONVICTION OF JARED LINCOLN FITZGERALD

31. On August 1, 2006, JARED LINCOLN FITZGERALD was arrested and charged with robbing the two banks in Wyoming in June 2006. On June 1, 2007, FITZGERALD was sentenced by United States District Court Judge Clarence Brimmer, District of Wyoming, to 168

months of incarceration followed by 36 months of supervised release. The plea agreement included the Utah bank robbery in July 2006. Although FITZGERALD confessed to the Arizona robberies detailed above, the plea agreement did not include these robberies because, as documented by the investigating agent, the AUSA believed the sentence FITZGERALD received in Wyoming was sufficient.

32. At the time of his arrest, FITZGERALD was interviewed at the Laramie County Sheriff's Department located in Cheyenne, Wyoming. FITZGERALD was advised of his Miranda rights utilizing the FBI FD-395. FITZGERALD stated he understood his rights and that he wished to waive his rights. FITZGERALD provided the following information:

33. On April 15, 2006, FITZGERALD walked away from a Colorado Department of Corrections halfway house where he was serving a sentence for auto theft. His status in the halfway house was being revoked and he was scheduled to be returned to a Colorado prison, where he would serve the remaining two years of his sentence. FITZGERALD left Colorado and traveled to Arizona.

34. FITZGERALD traveled to Arizona and rented a room. He resided in Tempe, Arizona, from late April through the beginning of June, 2006. FITZGERALD began robbing banks in Tempe, Arizona, as a means of supporting himself financially. He robbed approximately five banks while residing Tempe. FITZGERALD recalled robbing two Bank of America banks and three smaller banks. FITZGERALD robbed a bank every six to seven days from the end of April through May, 2006. FITZGERALD always presented a note to the bank employee, was polite, and never used a firearm; however, the notes stated he had a firearm.

35. During one of the Phoenix bank robberies, the bank employee placed a dye pack in with the money provided to FITZGERALD. The dye pack exploded approximately twenty feet outside the bank. FITZGERALD later placed the money in a washing machine, but the dye was not removed. He then placed the currency in a bathtub and poured lacquer over the money. The lacquer removed the dye. FITZGERALD was advised that several of the bills located in his wallet at the time of his arrest appeared to have been from the group which had been inside the bag with the dye. FITZGERALD confirmed the bills in his wallet were the last remaining from the dye pack.

36. FITZGERALD left Arizona at the end of May or first of June, 2006, and traveled back to Denver, Colorado. He robbed two banks in the Denver area within approximately two weeks.

FITZGERALD received approximately $3,000.00 from each bank. FITZGERALD described the location of the banks as being smaller banks located in residential areas. He utilized a taxi for transportation to and from the Denver robberies. In trying to provide an accurate timeline, FITZGERALD stated that the two Denver robberies could have occurred one on either side of the Security First robbery in Cheyenne, Wyoming, which occurred on June 12, 2006; however, it was his best recollection that the Denver robberies occurred prior to June 12, 2006.

37. FITZGERALD arrived in Cheyenne, Wyoming, on June 5, 2006. FITZGERALD robbed the Security First bank, 2051 East Lincolnway, Cheyenne, Wyoming, on June 12, 2006. He received approximately $1,000.00 in the robbery. FITZGERALD parked the black Chevrolet Corvette he was driving in the alley near the rear exit of the bank.

38. The white sports coat, tan baseball cap and black dress shoes, which were seized by the Laramie County Sheriff's Department at the time of FITZGERALD's arrest, were the same articles of clothing worn by FITZGERALD during the robberies of Security First, Bank of the West, located in Casper, Wyoming, and the attempted robbery of Sterling Bank, located in Billings, Montana.

39. On June 29, 2006, FITZGERALD robbed the Bank of the West, located in Casper, Wyoming. FITZGERALD changed the wording on the note he provided the bank employee. The note announced the robbery and instructed the bank employee to retrieve the money from the vault. The Bank of the West robbery was the first time FITZGERALD instructed the bank employee to take the money from the vault or provided a duffle bag in which to place the money. He obtained approximately $20,000.00 from the Bank of the West. FITZGERALD traveled to either Cheyenne, Wyoming, or Denver, Colorado, following the Bank of the West robbery.

40. On July 19, 2006, FITZGERALD attempted to rob the Sterling Bank, located in Billings, Montana. FITZGERALD approached a female whom he thought was the manager; however, the employee was not the manager. FITZGERALD handed the employee the note instructing her to remove the money from the vault. FITZGERALD became nervous as he had been in the bank too long. FITZGERALD left the bank without any money. FITZGERALD stated, "I went in there at the wrong time. The bank manager wasn't there and the lady I spoke to did not have keys to anything." FITZGERALD drove to Blackfoot, Idaho, following the attempted robbery of the Sterling Bank, where he spent the night in a hotel.

41. On July 20 or 21, 2006, FITZGERALD was en route to Reno, Nevada when he stopped in Salt Lake City, Utah. FITZGERALD went into a Federal Credit Union, located approximately five minutes from downtown Salt Lake City, and spoke with the credit union manager. His original plan was to rob the credit union; however, there were too many people inside so he left without giving the manager the note, which would have announced the robbery.

42. On July 22 or 23, 2006, FITZGERALD returned to the credit union in Salt Lake City, which he had visited the day before. FITZGERALD approached the same manager and handed her a note announcing the robbery. FITZGERALD handed the credit union manager a red duffle bag, which she filled with money from the vault. FITZGERALD was out of the bank approximately 20 seconds after giving the manager the note announcing the robbery. FITZGERALD got into his car and left the area. FITZGERALD received approximately $70,000.00 from the credit union robbery.

43. FITZGERALD was in Reno and Windover, Nevada, July 24-25, 2006. FITZGERALD gambled at local casinos and in private poker games, which took place at private residences. He learned of the private poker games while conversing with various individuals in the casinos. FITZGERALD indulged in sports betting and poker at the Rainbow and Montigo Bay casinos.

44. FITZGERALD was in possession of approximately $55,000.00 at the time of his arrest. He advised that approximately $20,000.00 to $30,000.00 was derived from gambling, with the remainder being proceeds from the bank robberies he had committed.

45. It was FITZGERALD's practice not to go into a bank prior to the time he planned to carry out the robbery. In the event the bank had a high volume of people or there was no rear exit, FITZGERALD would simply leave the bank. FITZGERALD picked banks which had parking in the rear and he would structure his robberies to take place at times he estimated would be slow. FITZGERALD went into at least two banks which did not meet his criteria, so he simply left the banks without attempting the robbery. FITZGERALD wrote out the notes he used to announce the robbery prior to entering the bank. FITZGERALD made sure he always retrieved the note from the bank employee prior to leaving the bank. FITZGERALD shredded the note and either burned the pieces or flushed the pieces down the toilet.

46. Troy VanOrden is a friend of FITZGERALD who resides on Wimbledon Court, Colorado Springs, Colorado. VanOrden has no knowledge of FITZGERALD's criminal activity. FITZGERALD requested he be allowed to retrieve several telephone numbers which were stored

in the memory of his cellular telephone. The cellular telephone had been seized by the Laramie County Sheriff's Department at the time of his arrest. The following telephone numbers included Troy VanOrden 719-640-2290.

47. FITZGERALD advised he committed the bank robberies because he needed money. FITZGERALD described robbing banks as a means of obtaining "easy cash" and stating "any dummy can do it."

## RELEASE AND ONGOING CRIMINAL ACTIVITY
## OF JARED LINCOLN FITZGERALD

48. FITZGERALD was released from federal prison on or about October 31, 2018. After satisfying a state term of incarceration, he started his federal supervised release program in Colorado on January 8, 2020. His current address of record with U.S. Courts Probation and Pretrial Services is 2435 Wimbleton Court, Colorado Springs, Colorado.  His telephone number is 303/242-9535 and his email address is fitzgeraldjared@icloud.com. Colorado Department of Labor records show he has been employed by JDT Incorporated since the first quarter of 2020. JDT Incorporated is the parent company of Mountain Cellars liquor store at 8290 Razorback Road, Colorado Springs, Colorado. FITZGERALD's probation officer confirmed he works at Mountain Cellars and his direct supervisor is Troy VanOrden. FITZGERALD reported to his probation officer that he drives an older model Mercedes-Benz GL550 SUV.

### July 24, 2020 Mid First Bank Robbery

49. On July 24, 2020, at approximately 9:45am, an unidentified man (the robber) entered the MidFirst Bank at 101 North Cook Street, Denver, Colorado. The robber approached the desk of bank employee J.M. carrying a clipboard. He flipped the clipboard over and showed J.M. a note taped to the back. The note said, "This is a robbery." The robber then addressed all three bank employees by saying something similar to "There is a problem. The problem is you're being robbed." The robber lifted the front of his shirt to reveal a black handgun in his waistband. The robber ordered all the employees to the vault.

50. J.M. and co-worker C.H. struggled to open the vault because they were afraid. The robber became increasingly hostile and began yelling at them. At one point, he began counting down and the employees feared they would be shot. Their third attempt to access the vault was

successful. The robber placed $124,100.00 from the vault into a backpack. He ordered the employees to stay inside the vault as he exited the bank.

51. The robber was described as a white male in his 30's or 40's, approximately 6'0"-6'3" tall with a medium build. He wore Carhart style pants, a bright yellow shirt with reflective lines, a yellow hard hat, and a face covering.

52. J.M. described a suspicious incident that occurred approximately two weeks prior at the bank. A man entered the bank dressed as a construction worker. The man said there was an issue with the water control valves located behind the teller counter. J.H. escorted the man to the back of the bank where he apparently was satisfied the issue had been resolved. He then left the bank. J.M. believed the incident was related to the robbery.

53. Your Affiant reviewed images from the suspicious incident on July 9, 2020, and from the robbery on July 24, 2020. The individual in both events was wearing what appeared to be the same shirt and hard hat and had matching physical descriptions. Your Affiant believes the same man was involved in both events.




July 9, 2020 Suspect                    July 24, 2020 Suspect

**October 9, 2020 Mid First Bank Robbery**

54. On October 9, 2020, at approximately 9:25am, a white man (the robber) entered the MidFirst Bank at 101 North Cook Street, Denver, Colorado. The robber approached the gate to

the teller line with a gun in his hand. He ordered bank employees J.M. and C.H., who were both present during the previous MidFirst robbery, to access the vault room. C.H. asked the robber what would happen if she did not comply. The robber pointed his gun at J.M. and said, "I'll shoot this bitch."

55. The robber forced all bank employees into the vault room. He said, "If the cops come there will be a shootout." The robber removed cash from both safes inside the room. He put $223,136.00 into a duffel bag before leaving the bank.

56. J.M. was sure the robber was the same person who robbed the bank on July 24, 2020.



October 9, 2020 Suspect

**April 13, 2021 Pueblo Bank Robbery**

57. On April 13, 2021, at approximately 9:00am, an unidentified male (the robber) entered the Power Credit Union located at 1615 East Evans Avenue, Pueblo, Colorado. He was wearing a reflective construction vest, a yellow hard hat, black sweatpants, and new black and white Adidas shoes. He was described as a white male, approximately 6'2", approximately 170 pounds, approximately 35 years old, with short dark hair and light-colored eyes. The robber was greeted by C.M. He requested to speak with the manager regarding asphalt work in the bank parking lot. The robber signed-in with the name "Marcus Briness."

58. V.T. came out to assist the robber. He told V.T. he worked for ADP and he was there to complete some asphalt work. V.T. explained that they had hired another company for the asphalt work. At that time, the robber said he wanted to show V.T. the work order. The robber then displayed a robbery note in a notepad attached to a clipboard. The demand note read as follows: "YOU ARE BEING ROBBED I SEE COPS = YOU DIE TO ENSURE YOUR SAFETY YOU MUST DRAW EMPLOYEES AWAY FROM ALARMS NO DYE PACKS OR TRACKING DEVICES GO TO SAFE."



April 13, 2021 Suspect



April 13, 2021 Robbery Note

59. The robber told V.T. to remain calm and to move quickly so he would not have to hurt her. He directed V.T. to open the vault. V.T. explained that she needed to retrieve the combination from her office and that she would need a second person to access the vault. V.T. first asked A.B. to assist her in opening the vault and later asked S.K. to help them as well. At one point, the robber told A.B. he would take them hostage if the police showed up.

60. The robber directed all three bank employees to sit down inside the vault as he removed the money from the safe and placed it into a black plastic bag. The robber took $56,280.00. After removing the money, he ordered V.T. to walk him out of the bank. V.T. watched the robber enter a silver vehicle parked south of the bank on Canal Street.

61. Responding officers recovered several items of evidence from the bank, including a brown clipboard with a notepad attached. The clipboard and notepad were left by the robber on top of a safe inside the vault.

62. In addition to the robbery note, Investigator Cardona of the Pueblo Police Department observed a list of names and telephone numbers written on a piece of paper contained within the notepad left by the robber. Various types of alcohol were listed by most of the names.



63. Investigator Cardona contacted several individuals on the list. One male on the list said the alcohol written by his name is his favorite beverage and that he purchased the rare liquor from Mountain Cellars in Colorado Springs. A second male, interviewed later by your Affiant, said he placed his name on a list at Mountain Cellars in Colorado Springs and asked to be contacted if a certain rare liquor became available. One female on the list said the alcohol listed next to her name is a rare wine that she could only find at Mountain Cellars in Colorado Springs. Others on the list said they did not know why their names were included, and some said they put their names on multiple contact lists.

64. Based on these responses, your Affiant believes the list was generated during the normal course of business at Mountain Cellars liquor store in Colorado Springs. The list was created to keep track of customers who should be contacted when specific types of rare alcohol became available.

65. On July 7, 2021, your affiant received several hand-written documents completed by JARED FITZGERALD. The documents were provided by FITZGERALD's probation officer and included multiple travel authorization requests. The first request was FITZGERALD asking

14

for permission on March 3, 2021, to travel to Boca Raton, Florida to visit his girlfriend, Tara Yesbick.  The second request was FITZGERALD asking for permission to travel out-of-state between April 21, 2021, and May 19, 2021, to get married, visit his in-laws, and to go on his honeymoon.

66. Your affiant visually compared the writing of the bank robbery note from the Power Credit Union robbery with the two documents completed by FITZGERALD. Your affiant determined the writing in the bank robbery note was consistent with the writing in the documents completed by FITZGERALD. The comparison items are as follows:



 Robbery Note       Honeymoon Request

## FINANCIAL INFORMATION

67. FITZGERALD filed a travel request with his probation officer seeking authorization to travel to Boca Raton, Florida by air. He planned to visit his girlfriend, Tara Yesbick, from January 14, 2021, through January 19, 2021. He stated the trip would cost $200.

68. On March 3, 2021, FITZGERALD filed another travel request seeking authorization to travel to Boca Raton, Florida by air.  Again, he planned to visit his girlfriend, Tara Yesbick.  He estimated the trip would cost $200.

69. FITZGERALD filed another travel request seeking authorization to travel throughout the United States between April 21, 2021 and May 19, 2021, for his wedding and honeymoon. He represented he would be driving to Las Vegas where he planned to stay at the MGM Grand hotel. He would then drive to San Antonio, Texas, where he would be staying in a rental house before driving on to Florida to stay in another rental house. He listed $3500 as the total cost of the trip.

70. Your affiant reviewed a financial report dated April 21, 2021, showing that FITZGERALD's girlfriend, Tara Yesbick, purchased a 2021 BMW X3 for $54,749. She paid $17,500 in cash and listed "office manager" as her occupation. The report for the transaction was filed the same day FITZGERALD and Yesbick reportedly started their honeymoon.

71. FITZGERALD consistently provides $2,461 as his monthly income and $1,500 as his monthly rental expense. On March 3, 2021, he provided $2,461.56 as his monthly income with no other sources of income. His monthly expenses were listed as $2,460.30, including a trip to Florida for $100.

72. Your Affiant believes FITZGERALD intentionally under-reported the expenses related to each of these trips. Your affiant believes FITZGERALD supplements his travel expenses with proceeds from his bank robberies.

## SUMMARY

73. Your Affiant believes the same person is responsible for the robberies of the MidFirst Bank on July 24, 2020, the MidFirst Bank on October 9, 2020, and the Power Credit Union on

April 13, 2021. The suspect in the two MidFirst robberies was identified by the victims as the same person, and the suspect made statements confirming he was responsible for both robberies. Additionally, the physical description and the modus operandi of the robber in each of the MidFirst robberies are consistent.

74. The physical description of the suspect in the Power Credit Union robbery matches the physical description of the MidFirst robber. The Power Credit Union robber was wearing white and black Adidas shoes that match the shoes worn by the robber during the second MidFirst robbery. The Power Credit Union robber was also wearing a yellow hard hat that appeared to be the same one worn during the first MidFirst robbery. The robber in the first MidFirst robbery used a clipboard and a construction ruse to gain access to the bank. The robber of the Power Credit Union also used a clipboard and a construction ruse. The suspect in all three robberies focused exclusively on the vault, which is a rare occurrence.

75. Your Affiant believes JARED FITZGERALD is responsible for all three robberies. FITZGERALD has a long, extensive history of robbing banks. FITZGERALD's modus operandi evolved during his robberies in 2006. He started by robbing individual tellers using a demand note. The amounts of money he took during those early robberies were minimal. Prior to his arrest in 2006, FITZGERALD started using a ruse to scout the bank prior to the robbery and to contact a management-level bank employee who would have access to the vault. By his last robbery in 2006, FITZGERALD was focused exclusively on the vault where he was able to steal more significant quantities of money.

76. Your Affiant believes FITZGERALD used the notepad left at the Power Credit Union robbery during the normal course of business at the Mountain Cellars liquor store where he is currently employed. In addition to the robbery note, the notepad also included customer lists, office supply lists, and information related to an Apple MacBook computer. He used the notepad to write and present the robbery note, and he accidently left it behind during the robbery. As demonstrated above, the writing in the robbery note is consistent with known writing samples from FITZGERALD.

77. Your Affiant believes location information associated with FITZGERALD's cellular telephone number 303/242-9535, as provided by his probation officer, likely constitutes evidence of the three 2020-2021 robberies detailed above. Based on training and experience, your Affiant knows almost all adults in the United States have and carry cellular telephones with them on a

regular basis. Your Affiant believes evidence derived from the location data associated with telephone number 303/242-9535 will assist investigators in identifying the perpetrator of the three 2020-2021 robberies.

78. Using the FBI's electronic telephone number services (eTNS) application, your Affiant determined Verizon Wireless is the service provider for telephone number 303/242-9535.

79. Your Affiant knows Verizon Wireless is a company that provides cellular telephone service to the general public. Providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

80. Your Affiant knows Verizon Wireless can collect E-911 Phase II data about the location of the Target Telephone, including by initiating a signal to determine the location of the Target Telephone on Verizon Wireless's network or with such other reference points as may be reasonably available.

81. Verizon Wireless can collect historical cell-site data about the Target Telephone, as defined in Attachment A hereto. For each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Verizon Wireless typically collect and retain cell-site data pertaining to cellular

devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

82. This information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Telephone's users, may place the suspect within the proximity of the scenes of the crimes, and may assist in the identification of a fugitive, of co-conspirators, and/or victims.

### AUTHORIZATION REQUEST

83. Based on the foregoing, your Affiant requests the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

84. It is further requested that the Court direct Verizon Wireless to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Verizon Wireless, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

85. It is further requested, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Telephone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

86. It is further requested that this Court order Verizon Wireless not to disclose the existence of the warrant for a period of one year from the date of issuance. The requested warrant, if disclosed, could result in the suspect or co-conspirators fleeing from prosecution, destroying

evidence; intimidating witnesses or otherwise seriously jeopardizing the ongoing investigation. See 18 U.S.C. § 2705(b)(2), (3), (5).

Respectfully submitted,

/s/ Donald Peterson
Donald Peterson, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on July 12 , 2021

UNITED STATES MAGISTRATE JUDGE

Reviewed and submitted by Brian Dunn, Assistant United States Attorney.